FIRST, ALBRECHT & BLONDIS, S.C.
Thomas C. Lenz, Esq.
158 N. Broadway, Suite 600
Milwaukee, WI 53202
tlenz@fabattorneys.com


Joel H. Siegal, Esq.
235 Montgomery Street, Suite 800
San Francisco, CA  94104
Tel: (415) 777-5547
Fax: (415) 777-5247
joelsiegal@yahoo.com

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel*. JANE DOE and JOHN DOE | CIVIL ACTION 4:16-CV-5241-KAW |
| Plaintiffs,<br><br>v.<br><br>SINGULEX, INC.<br><br>Defendant. | **PLAINTIFF SWARTZELL'S NOTICE OF MOTION; MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT; and MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>[[Proposed] Order submitted concurrently herewith]<br><br>Hearing Date: March 21, 2019<br>Hearing Time: 1:30 PM<br>Courtroom: 4, 3rd Floor<br><br>The Honorable Kandis A. Westmore<br>Complaint Filed: September 13, 2016<br>Trial Date: None Set |

## NOTICE OF MOTION AND MOTION

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**PLEASE TAKE NOTICE THAT** on X at X PM before the Honorable Kandis A. Westmore in Courtroom 4, 3rd Floor, 1301 Clay Street, Oakland, California, Plaintiff Vicki Swartzell ("Swartzell') will and hereby does move this Court for an order granting Swartzell leave to file a Third Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2) and Civ. L. R. 7-2.

The grounds for this Motion are described in Swartzell's Memorandum of Law in Support of Swartzell's Motion for Leave to File a Third Amended Complaint. This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Law in Support, the records on file in this action, and on such evidence and argument as may be presented during further briefing and at the hearing of the Motion.

Dated:  February 8, 2019

By: /s/ Thomas C. Lenz_____
FIRST, ALBRECHT & BLONDIS, S.C.
Thomas C. Lenz, Esq.
158 N. Broadway, Suite 600
Milwaukee, WI 53202
Tele: (414) 271-1972
Fax:  (414) 271-1151
tlenz@fabattorneys.com

Joel H. Siegal, Esq.
235 Montgomery Street, Suite 800
San Francisco, CA  94104
Tel: (415) 777-5547
Fax: (415) 777-5247
joelsiegal@yahoo.com

Case No. 4:16-CV-05241-KAW
Swartzell Motion for Leave to File Third Amended Complaint

1
2
3

## MEMORANDUM OF LAW IN SUPPORT OF SWARTZELL'S MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

Plaintiff Vicki Swartzell, one of the *qui tam* relators ("Swartzell"), by and through her undersigned counsel, hereby respectfully moves this Court for an Order permitting her to supplement and amend her Complaint to add additional facts and claims relating to retaliation, constructive discharge, and Wisconsin wage law violations to which Swartzell was subjected by Singulex. The amendment would also remove some of the False Claims Act ("FCA") claims and facts that have been resolved. The additional facts and claims further support the claims alleged in the Second Amended Complaint and allow Swartzell to fully litigate her own claims, which relate to the fraud of Singulex. A copy of the proposed Third Amended Complaint is attached hereto as Exhibit 1.

### I.    FACTUAL BACKGROUND

Proceeding on behalf of the United States pursuant to the federal False Claims Act, 31 U.S.C. §§3729, *et seq.*, Swartzell (formerly "Jane Doe") and John Doe filed their original Complaint under seal in September 2016. Swartzell and John Doe brought claims on behalf of the federal government for False Claims Act violations and were represented by the firm of Berger & Montague. Swartzell and John Doe amended their original Complaint in May 2017 to add additional factual allegations that arose after the original Complaint was filed. In May, 2018, Swartzell amended the Complaint for a second time to add her own FCA retaliation and Wisconsin wage claims by her own personal counsel, First, Albrecht & Blondis, S.C. The Second Amended Complaint alleges that Singulex had submitted false claims for reimbursement for testing services to Medicare, Medicaid, and other federal programs. These FCA claims brought on behalf of the federal government have been resolved between Singulex and the United States Government. Accordingly, Swartzell now seeks leave to file a Third Amended Complaint that clarifies and

bolsters her personal claims for retaliation under the False Claims Act, 31 U.S.C. § 3730(h), and for unpaid wages pursuant to Wisconsin wage laws. Swartzell also seeks to remove the settled claims that appear in the Second Amended Complaint.

Since the filing of the original Complaint, Singulex harassed, otherwise discriminated against, and underpaid Swartzell for her refusal to engage in its fraudulent scheme, thereby constructively discharging her. Swartzell now seeks to clarify her personal claims and remove the settled claims, and therefore seeks leave to file a Third Amended Complaint. Attached hereto as **Exhibit 1** is a copy of Plaintiff Vicki Swartzell's Proposed Third Amended Complaint for the Court's consideration.

## II.   ARGUMENT

### A.   Leave to Amend Should Be Granted

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party may amend its pleading at any time by leave of the court, and "the court should freely give leave when justice so requires."  If the movant has at least colorable grounds for relief, justice requires allowing amendments unless the movant is guilty of undue delay or bad faith, if the amendment would unduly prejudice the opposing party, or if the amendment would be futile.  *Foman v. Davis*, 371 U.S. 178 (1962).

Here, no reason exists to deny Swartzell the opportunity to amend the complaint to bring her claims for federal False Claims Act retaliation and unpaid wages under Wisconsin law. The amendment is not the result of bad faith or dilatory motive. The repeated failure to cure the deficiencies factor is not applicable because this is the first amendment that addresses alleged deficiencies. The amendment could be futile should the Court compel arbitration of Ms. Swartzell's claims. However, Plaintiff's Brief in Opposition to Defendant's Motion to Compel Arbitration demonstrates that arbitration should not be foisted upon Ms. Swartzell. Furthermore, arbitration would still require an operative complaint in the event the Court does compel arbitration in this matter. Thus, the amendment would not be futile. Additionally, "[n]ot all of the

4

factors merit equal weight . . . it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003) (citations omitted).

Lastly, Defendant here is not prejudiced by the proposed amendment because the Defendant has had notice of Ms. Swartzell's claims, even prior to the seal being lifted on August 22, 2018. (Dkt. 17, Notice of Intervention for the Purposes of Settlement and Order to Unseal.) Moreover, Counsel for Ms. Swartzell has, to date, granted Singulex four extensions to respond to the Second Amended Complaint. (Dkt. Nos. 21, 24, 27, and 29.) Once the Second Amended Complaint was unsealed and subsequently served on September 17, 2018, Singulex then took approximately four months to finally file the Motions currently at issue. Prejudice simply cannot be established under these facts.

It is also important to note that Swartzell has been represented by two firms for this matter, one firm, Berger & Montague focused on the *qui tam* action under the False Claims Act, while the other firm, First, Albrecht & Blondis, focused on the retaliation and wage claims. The Second Amended Complaint was the first pleading in which any allegations from First, Albrecht & Blondis relating to Swartzell's retaliation and wage claims are present.

Leave to amend should be granted because counsel has "posit[ed] possible amendments that would be consistent with the operative complaint and could also possibly state a claim for relief." *Orion Tire Corp. v. Goodyear Tire & Rubber Co.,* 268 F.3d 1133, 1137 (9th Cir. 2001).

## **CONCLUSION**

For the forgoing reasons, Plaintiff Swartzell respectfully requests leave to file a Third Amended Complaint.

Dated:  February 8, 2019                    By: /s/ Thomas C. Lenz

Case No. 4:16-CV-05241-KAW
Swartzell Motion for Leave to File Third Amended Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

FIRST, ALBRECHT & BLONDIS, S.C.
Thomas C. Lenz
158 N. Broadway, Suite 600
Milwaukee, WI 53202
Tele: (414) 271-1972
Fax:  (414) 271-1151
tlenz@fabattorneys.com

Joel H. Siegal, Esquire
235 Montgomery Street, Suite 800
San Francisco, CA  94104
Tel: (415) 777-5547
Fax: (415) 777-5247

Case No. 4:16-CV-05241-KAW
Swartzell Motion for Leave to File Third Amended Complaint

# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|                        |     |                       |
|------------------------|-----|-----------------------|
|                        | )   |                       |
|                        | )   |                       |
|                        | )   | CIVIL ACTION          |
|                        | )   |                       |
|                        | )   |                       |
| Plaintiffs,            | )   |                       |
|                        | )   |                       |
| v.                     | )   |                       |
|                        | )   |                       |
|                        | )   | JURY TRIAL DEMANDED   |
|                        | )   |                       |
| Defendant.             | )   |                       |

FIRST, ALBRECHT & BLONDIS, S.C.
Thomas C. Lenz
158 N. Broadway, Suite 600
Milwaukee, WI 53202
Tele: (414) 271-1972
Fax:  (414) 271-1151
tlenz@fabattorneys.com


Joel H. Siegal, Esquire
235 Montgomery Street, Suite 1060
San Francisco, CA  94104
Tel: (415) 777-5547
Fax: (415) 777-5247
joelsiegal@yahoo.com

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| *ex rel*. VICKI SWARTZELL and | ) | |
| JOHN DOE | ) | CIVIL ACTION 4:16-CV-05241-KAW |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SINGULEX, INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**RELATORS' THIRD AMENDED COMPLAINT**

1

2

TABLE OF CONTENTS

3   I.      SUMMARY OF THE ACTION ...................................................................2

4   II.     JURISDICTION AND VENUE ..................................................................4

5   III.    THE PARTIES...........................................................................................5

6   IV.     THE LAW...................................................................................................5

7           A.      The Federal False Claims Act.......................................................5

8           B.      Wisconsin Wage Law ...................................................................6

9   V.      SWARTZELL'S FACTUAL ALLEGATIONS RELATING TO VIOLATION OF THE
10          FEDERAL FALSE CLAIM'S ACT'S ANTI-RETALIATION PROVISION AND
            WISCONSIN UNPAID WAGES ................................................................6
11
            A.      Swartzell's Background with Singulex..................................................6
12
            B.      Swartzell Learns that Singulex is Violating Federal False Claims Act, 31 U.S.C.
13                  3729 ("FCA")..................................................................................8

14          C.      October 4, 2015 National Sales Meeting – New Orleans**Error! Bookmark not defined.**
15
            D.      February 9, 2015 National Sales Meeting – Dallas ...............................................11
16
            E.      May 15-18, 2016 Eastern and Southern Regional Sales Meeting – Newark.........13
17
            F.      United Healthcare Out-of-Network Agreement.....................................................14
18
            G.      Singulex's Failure to Pay Swartzell Commissions for Payments Submitted by
19                  Patients ...............................................................................................17

20          H.      Addition of ICD10 Codes to Requisition Forms ...............................17

21          I.      Swartzell Calls the Fraud Hotline Twice ...............**Error! Bookmark not defined.**
22
            J.      Mark Goddard is Put on a Performance Plan.........**Error! Bookmark not defined.**
23
            K.      Bob Brousseau Fails to Timely Reimburse Swartzell for Her Expenses....... **Error!
24                  Bookmark not defined.**

25          L.      Bob Brousseau Disproportionately Increases Swartzell's 2017 Sales Target**Error!
26                  Bookmark not defined.**

27          M.      Singulex's Failure to Timely Pay Swartzell's December 23, 2016
                    Commission .........................................................**Error! Bookmark not defined.**

RELATOR'S THIRD AMENDED COMPLAINT

N.      Travis Bales Fails to Timely Pay Swartzell's Expenses**Error! Bookmark not defined.**

O.      Tuition Reimbursement ..........................................**Error! Bookmark not defined.**

P.      Travis Bales Undermines Swartzell and Advises Provider to Engage in Fraud**Error! Bookmark not defined.**

Q.      Mobile Phlebotomy...............................................**Error! Bookmark not defined.**

R.      Profitability Exercise ...........................................................30

S.      April 2017 Commission Statement .......................................31

T.      July 25, 2017 Manager Ride Along .......................................31

U.      Singulex's Constructive Discharge of Swartzell ...................................32

VI.     COUNTS..............................................................................32

1.      This action was originally brought on behalf of the United States of America, plaintiff-relators Vicki Swartzell and John Doe ("Relators") against Defendant Singulex, Inc. ("Singulex" or "Defendant") for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (hereinafter referred to as the "Federal False Claims Act"). These claims have been settled.

2.      Plaintiff Vicki Swartzell ("Swartzell") brings this action against Defendant Singulex, Inc. for violations of the Federal False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h), and the Wisconsin's Wage Payment and Collections Laws ("WWPCL") (Wis. Stat. § 109.01 *et seq.*

## I.    <u>SUMMARY OF THE ACTION</u>

3.      This action was originally brought to recover damages and civil penalties on behalf of the United States arising out of Defendant Singulex's submission of false and fraudulent claims for payment to Medicare, Medicaid and other government health care programs for medically unnecessary lab tests.

4.      During all relevant times hereto, Defendant Singulex was a clinical laboratory offering a menu of over 100 blood tests to help physicians diagnosis and treat patients. The majority of

Singulex's tests are covered by Medicare, so long as the tests are medically necessary for the diagnosis and treatment of the patient.

5.      Starting about July 2015, Defendant devised a multi-faceted fraudulent scheme to increase Medicare coverage and reimbursement for its lab tests, without regard to medical necessity. This scheme was directed and orchestrated by Singulex executives.  The main goal of the project was not to ensure the medical necessity of the lab testing, but to increase profits through enhanced reimbursements without regard to the medical necessity of the tests.

6.      In July 2015 Swartzell discovered that Singulex was cancelling lab tests ordered by medical providers without notifying the providers, the patients, or the Area Business Executives ("ABEs").  Swartzell was employed as an ABE by Singulex. Swartzell began investigating the cancellations and discovered that Singulex was cancelling tests that, while medically necessary, would not lead to a high reimbursement by government programs such as Medicare, Medicaid, and Tricare. Swartzell decided that she would not participate in defrauding the federal government, so she began gathering evidence of Singulex's fraudulent conduct. She also began exposing the fraud.

7.      As part of the fraudulent reimbursement coding scheme Swartzell learned that Singulex carefully redesigned its requisition form – the form used by physicians in ordering Singulex's lab tests. In combination with the revised requisition form, the Company's top management exerted significant pressure on the ABEs and administrative staff (the "Physician Services Department") to aggressively convey false lab test coding information to providers. Specifically, upper management instructed Singulex employees to direct providers to falsely use certain diagnosis codes on the requisition form, without regard to the patient's medical condition, so that Singulex would be reimbursed by Medicare.

8.      Since introducing the initial, revamped requisition form in May 2016, Singulex has revised the form numerous times, adding additional lab tests and manipulating the diagnosis codes, all

RELATORS' THIRD AMENDED COMPLAINT                                                    3

geared towards maximizing government reimbursement. All the while, upper management has continued to pressure ABEs not only "to get" certain diagnosis codes from providers which are not applicable to their patients' medical condition, but to add additional testing that is not medically necessary. As a result, in total, the following unlawful conduct occurred:

- Singulex ABEs and the Physician Services Department were exerting <u>significant pressure on physicians to check off certain diagnosis codes</u> to ensure reimbursement for the lab tests and without regard to the patients' medical conditions.

- If the physician did not check off certain diagnosis codes, Singulex ABEs, the Physician Services Department and phlebotomists (at the direction of sales reps) were <u>adding the diagnosis codes themselves,</u> without the physician's knowledge or consent, in order to falsely justify medical necessity and ensure high reimbursement for the tests ordered.

- Singulex ABEs were pressuring physicians to <u>add certain lab tests (</u>*e.g.,* allergy panels, osteoporosis and rheumatoid arthritis biomarkers) to their requisitions without regard to medical necessity.

- If the physician had not added certain lab tests, some Singulex ABEs, phlebotomists (at the direction of ABEs), and the Physician Services Department at Singulex were <u>adding these tests themselves,</u> without the physician's knowledge or consent.

9.      Swartzell is aware of several physicians who have rightly been angered and outraged by this pressure to add diagnosis codes and tests without regard to their patient's medical condition, a determination which is solely within their medical judgment.  Further, Swartzell is aware that other physicians have stopped using Singulex for lab tests when they have discovered Singulex has added lab tests to their orders without their knowledge or consent.

10.     Singulex has been penalized for fraudulent conduct before.  In April 2015, Singulex entered into a settlement agreement with the government resolving allegations that it paid physicians for lab referrals in violation of the Anti-Kickback Statute and for billing for medically unnecessary lab tests as a result of the tainted referrals.  Singulex also entered into a Corporate Integrity Agreement (CIA) with the government which puts in to place procedures and reviews to promptly detect fraudulent conduct.  Despite this settlement and CIA, Singulex continued its fraudulent practices.

## II.    JURISDICTION AND VENUE

11.    Jurisdiction is founded upon the FCA, 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331 and 1367.

12.    Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. § 1391(b) and (c).

## III.    THE PARTIES

13.    Plaintiff Vicki Swartzell is an adult resident of the State of Wisconsin, County of Milwaukee, and Village of Fox Point.  At all relevant times hereto, Ms. Swartzell was an employee of Singulex, Inc.

14.    At all relevant times hereto, Defendant Singulex, Inc. ("Singulex") was and is a private company involved in the field of clinical laboratory testing and is incorporated in Delaware with its corporate headquarters and laboratory located in Alameda, California.  At all relevant times, Singulex offered blood tests that primarily focus on the assessment of chronic conditions such as cardiovascular health, inflammation, diabetes, abnormal cholesterol, or hormone imbalances, as well as prostate cancer monitoring.  Singulex offers five blood tests that apply its proprietary technology to measure cardiovascular health and inflammation.  At one point in time, Singulex spun off its laboratory testing component into a subsidiary company called Veridia.  Throughout the Complaint, Singulex and Veridia shall be referred to as Singulex.

15.    John Doe is a former relator in this litigation.  He is no longer an active party because of the settlement of the False Claims Act claims.

## IV.    THE LAW

### A.    The Federal False Claims Act

16.     The Federal False Claims Act ("FCA") provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

17.     In addition to the above prohibited conduct, the FCA prohibits individuals and employers from discharging, demoting, suspending, threatening, harassing, or in any manner discriminating against an employee or other who furthers any action under the FCA or takes measures to stop one or more violations of the FCA. 31 U.S.C. § 3730(h).

**B.     Wisconsin Wage Claims**

18.     Singulex must pay the full amount of its employee's wages within 31 days of being earned under Wis. Stats. §§ 109.03(1) and 109.01(3).

19.     Pursuant to Wis. Stat. § 109.01(3), a "wage" is defined as "remuneration payable to an employee for personal services, including salaries, **commissions**, holiday and vacation pay, overtime pay, severance pay or dismissal pay, supplemental unemployment benefit plan payments when required under a binding collective bargaining agreement, bonuses and any other similar advantages agreed upon between the employer and the employee or provided by the employer to the employees as an established policy."

20.     Singulex knowingly did not pay Swartzell for all wages within 31 days of being earned and as a result violated Wis. Stats. §§ 109.03(1) and 109.01(3).

**V.     SWARTZELL'S FACTUAL ALLEGATIONS RELATING TO VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT'S ANTI-RETALIATION PROVISION AND WISCONSIN UNPAID WAGES**

**A.     Swartzell's Background with Singulex**

21.     On November 6, 2014, Swartzell began working for Singulex.

22. Swartzell's job title with Singulex was "Area Business Executive," ("ABE") and her job duties were generally those of a Singulex laboratory representative, including coordinating use of Singulex testing products by medical providers in her territory, recruiting new customers for Singulex, and other duties.

23. Swartzell was the first Singulex employee assigned to the Wisconsin territory and she built the Wisconsin book of business from scratch. Michigan and Minnesota were later added to Swartzell's territory.

24. In approximately the summer of 2015, Singulex instructed Swartzell to begin offering mobile phlebotomy services in her territory, which involved hiring part-time phlebotomists to drive to patients' homes to collect blood samples for testing by Singulex.

25. Swartzell was responsible for coordination of the mobile phlebotomy services, unlike other sales territories in the US, which used Singulex in-house personnel for coordination of mobile phlebotomy.

26. Singulex paid ABEs, including Swartzell, base pay plus commissions based on the amount of testing services ordered by medical providers in the territory and the money collected ("cash collected") for those services.  The commission rate was based on the ABE's sales numbers, inclusive of the tests ordered and the cash collected in relation to the sales goals.

27. Medical providers are required to select the proper test coding for ordering of tests from companies that provide laboratory testing, such as Singulex.

28. Tests are identified for reimbursement by use of a code referred to as an International Statistical Classification of Disease and Related Health Problems, more commonly referred to as ICD9 codes (and ICD10 codes as of October 2015).

29.    At all relevant times hereto, Singulex had physicians' offices use testing order forms referred to as "requisition forms." The requisition forms included identifying information for the ordering physician and the patient. Additionally, the forms contained places for the physicians to record the ICD9 (and later ICD10) codes for the tests ordered. Singulex additionally included some ICD9 (and later ICD10) codes and testing descriptions with check boxes next to them.

30.    It is a violation of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(B) for ABEs or other Singulex staff to add additional ICD9 (and ICD10) codes onto forms that a physician has completed based on medical necessity.

31.    It is also a violation of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(B) for ABEs or other Singulex staff to encourage, instruct, coach, beg, or otherwise ask physicians to add ICD9 (and ICD10) codes to requisition forms.

**B.    Swartzell Learns that Singulex is Violating Federal False Claims Act, 31 U.S.C. 3729 ("FCA")**

32.    BNP testing, or "Brain Natriuretic Peptide" testing is used to test patients for congestive heart failure. At all relevant times hereto, Singulex offered BNP testing.

33.    In July 2015, Swartzell noticed that Singulex was cancelling laboratory tests for BNP testing for patients in her territory, including patients whose healthcare is paid for by government programs (Medicare, Medicaid, and Tricare) and private insurance. The cancelled BNP testing occurring in Swartzell's territory had been ordered by providers that were Singulex clients of Swartzell.

34.    Swartzell then contacted Juper Lin, Sales Support Associate at Singulex to inquire about the cancellation of the BNP test orders. Juper Lin informed Swartzell that the account in question had not included the required ICD9 code. Swartzell was not satisfied with the response from

RELATORS' THIRD AMENDED COMPLAINT                                    8

1   Lin, who directed Swartzell to follow up with Gary Jones, Director of Laboratory Information Systems

2   at Singulex.

3       35.   On July 9, 2015 Swartzell emailed Gary Jones and questioned why Singulex was

4   cancelling the BNP testing orders. Mr. Jones informed Swartzell that a policy had been put in place

5   several weeks before July 9, 2015, which required inclusion of an ICD9 code for congestive heart

6   failure. The policy required inclusion of a congestive heart failure ICD9 code, regardless of whether

7   the patient had been diagnosed with congestive heart failure. Jones informed Swartzell that BNP

8   testing ordered without an ICD9 code reflecting a diagnosis or symptoms of congestive heart failure

9   would result in cancellation of the test. Jones referred to BNP testing without such codes as a "smoking

10  money crater" for Singulex.

11      36.   Not all BNP testing for congestive heart failure is used for patients with a current

12  congestive heart failure diagnosis. BNP testing can be used to diagnose congestive heart failure or to

13  catch it at a very early stage. If caught early, congestive heart failure can be treated and in certain cases

14  it can be reversed.

15      37.   When ordering a BNP test for a patient without a congestive heart failure, it is

16  inaccurate and improper to use a diagnostic code reflecting a current congestive heart failure diagnosis,

17  as the inclusion of the congestive heart failure code will increase the reimbursement rate that the lab

18  receives from the government (Medicare, Medicaid, Tricare) and private payers.

19      38.   The response from Mr. Jones regarding the required inclusion of ICD9 diagnostic

20  coding reflecting a congestive heart failure diagnosis raised alarm bells for Swartzell. She understood

21  that Singulex had adopted a policy of forcing employees and medical providers to commit fraud on the

22  government by requiring the use and submission of inaccurate and illegal ICD9 diagnostic codes.

RELATORS' THIRD AMENDED COMPLAINT                                9

39.     Swartzell understood that forcing medical providers to put ICD9 codes reflecting that the patient had a congestive heart failure diagnosis when they did not caused the government programs (Medicare, Medicaid, and Tricare) to pay excessive charges for the services and to pay a higher percentage of the claims submitted.

40.     Once Gary Jones conveyed Singulex's fraudulent directive to Swartzell, she, in good faith, believed that Singulex was committing fraud against the government and decided to gather evidence of Singulex's fraudulent practices and attempt to expose the practices.

41.     Swartzell informed both Gary Jones and Mark Stene that she believed that the practice of cancelling BNP testing ordered by providers without an ICD9 code reflecting a current congestive heart failure diagnosis was improper, especially without notice to the patient and provider. Swartzell also expressed that she believed it was improper to direct a provider to use a specific ICD9 code.

42.     In response to the complaints raised by Swartzell, Mark Stene informed her that the lab needed to make money and that providers had to use ICD9 codes reflecting current congestive heart failure diagnoses regardless of whether that was accurate.

C.     **October 4, 2015 National Sales Meeting – New Orleans**

43.     In August 2015, Bob Brousseau, Vice President of Sales and Marketing ("Brousseau") at Singulex, asked John Doe for a list of the Area Business Executives that he supervised. Mr. Brousseau asked that the list be ranked by performance and value to the team so that he (Brousseau) could reach out to the top Singulex performers to introduce himself and obtain feedback regarding the strengths, opportunities for growth, market trends, requests from providers for new testing, success stories, utilization of cTnI[1] for non-acute patients, and any other relevant information for the successful

---

[1] cTnI is a cardiac troponin that is a highly sensitive and specific marker of myocardial damage.

1    implementation of Singulex testing. John Doe selected Swartzell as his top ABE and conveyed her

2    name to Mr. Brousseau.

3        44.     On October 4, 2015, Singulex held a national sales meeting in New Orleans, Louisiana.

4    Swartzell was in attendance at the meeting and questioned Brousseau, VP of Sales and Marketing at

5    Singulex in the Eastern and South Regional Sales and Marketing Meeting about the high cost of testing

6    reimbursement to commercial payers, which in some cases were 1,200% of the Medicare

7    reimbursement rate.

8        45.     In response to Swartzell's question, Brousseau informed Swartzell that Singulex would

9    not stop charging such high rates and that Swartzell would not like his answer to her question about

10    why such rates were charged.

11        46.     At a later point during the national sales meeting, regional breakout sessions were held.

12    John Doe asked the Eastern region to present business reviews. Brousseau was in attendance at the

13    Eastern region session, but abruptly got up and walked out when he saw Swartzell get up to present to

14    the group.

15        47.     Brousseau disregarded John Doe's August 2015 suggestion that he (Brousseau) contact

16    Swartzell to obtain feedback regarding the strengths, opportunities for growth, and market trends,

17    requests from providers for new testing, success stories, utilization of cTnI for non-acute patients and

18    any other relevant information for the successful implementation of Singulex testing from Swartzell.

19    Instead, Brousseau contacted Vanessa Switzler at the end of October 2015. John Doe had not ranked

20    Ms. Switzler as high as he ranked Swartzell.

### D.     February 9, 2015 National Sales Meeting – Dallas

21        48.     On February 9, 2016 Singulex held a national sales meeting in Dallas, Texas.  Singulex

22    ABEs from around the country, including Swartzell, attended the meeting.

49.     During the meeting, Brousseau announced that all area business executive, such as Swartzell, were going to be given access to all patient Protected Health Information ("PHI") in order to review the testing ordered by physicians for their patients. Brousseau explained that the PHI was to be used to target physicians and tell them to order additional testing.

50.     Swartzell understood that it was a violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(B), and HIPAA (Health Insurance Privacy and Accountability Act), 42 U.S.C. § 1320d, to access PHI and advise a doctor to add additional ICD10 codes to requisition forms and that only doctors could determine which tests were medically necessary.

51.     During the meeting, Swartzell questioned Brousseau, in open session in front of all ABEs, and others, regarding whether the practice of allowing ABEs access to PHI would violate HIPAA.

52.     Brousseau was aware that Swartzell was questioning whether PHI could be used in violation of federal law such as HIPAA.

53.     In response to Swartzell's point, Brousseau told Swartzell and the group that they were required to comply with his directive to access PHI and target doctors to add more testing. Brousseau further informed the group that they were "on their own" with respect to accessing the PHI and that Singulex would not defend any of the sales force for accessing and utilizing PHI to target physicians to add additional tests.

54.     Brousseau issued a direct marching order to the ABEs that they needed to login to Singulex Connect (Singulex's physician portal) to review patient PHI regarding the testing ordered so that they could contact the physicians to have the orders changed in a manner that would increase the money Singulex was paid.

55.     In another session, Rebecca Farrell, Brousseau, and Mark Stene gave a presentation during which they explained that they were reviewing the list of ICD10 codes to determine which ones reimbursed at the highest rates. Swartzell informed her supervisor, John Doe, that she believed the practice was illegal.

56.     The month following the Dallas national sales meeting Swartzell was given an annual review by her supervisor, John Doe. John Doe recommended a salary and stock options raise of .5% for Swartzell.

57.     Brousseau, in retaliation for Swartzell's exposing fraud, her gathering of evidence of the fraud, and because of her refusal to participate in fraudulent schemes, rejected John Doe's recommendation to give Swartzell a raise, and he shifted the raise in pay and stock options to another ABE, Vanessa Switzler.

58.     In Spring 2016 John Doe interviewed a candidate, Bill Wrintz, for an ABE position for the Indiana territory. Brousseau favored the candidate and told John Doe to have Mr. Wrintz speak with another ABE to gain their perspective.

59.     In response to Brousseau's directive, John Doe suggested having Mr. Wrintz speak with Swartzell or another employee, Nate. Brousseau, in an explicit display of disdain for Swartzell, responded by saying, "Vicki, really Vicki? No, don't have him call Vicki."

**E.      May 15-18, 2016 Eastern and Southern Region Sales Meeting - Newark**

60.     During all relevant times, Singulex used requisition forms for submission of medical providers' patient test orders. In May 2016, Singulex rolled out a new requisition form that included check boxes for codes that Singulex wanted providers to use because the tests listed were very profitable for Singulex.

61.     During a national sales meeting from May 15 to 18, 2016, Brousseau directed the Singulex's ABE force to instruct all providers to pick at least three of the codes on the front of the new requisition form.

62.     In response to Brousseau's directive, and in an effort to further investigate Singulex's fraud and expose it, Swartzell questioned Brousseau regarding what some of the codes meant.

63.     Multiple codes on the requisition form had nothing to do with cardiovascular disease, which was the main testing focus of Singulex. Rather, the codes on the requisition forms were ones that would reimburse Singulex at a high rate of pay at the expense of federal government programs (Medicare, Medicaid, and Tricare).

64.     Visibly irritated with Swartzell's questioning, Brousseau responded in a threatening tone that "it doesn't matter what the codes mean, you do not need to know what the codes mean, what you need to know is that you are to tell the providers to pick at least three of the codes from the front of the requisition."

65.     Immediately after Brousseau's outburst, Mike Hutzler, a Singulex ABE voiced up and said, "just tell the doctor to pick three to five codes from the front of the req [requisition form] and then SHUT UP."

66.     Singulex's practice of selecting high reimbursing codes for the front of its requisition form and directing its ABEs to require providers to select three of the codes violates the FCA, 31 U.S.C. § 3729(a)(1)(A)-(B).

67.     In addition to the sales force being directed to get additional ICD10 codes added, the Physician Services ("PS") department frequently called providers to encourage them to add codes. This practice was also a violation of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(B).

**F.      United Healthcare Out-of-Network Agreement**

68.    In Swartzell's territory one of the top private payers was United Healthcare ("UHC"). While Singulex was not an in-network provider for UHC insureds, UHC and Singulex maintained an agreement.

69.    Up until August 2015, UHC was paying an average of $44.57 per test for reimbursements paid to Singulex for testing done in Swartzell's territory.

70.    Private insurers such as UHC could take 45 to 90 days, and usually took 60 to 90 days to make payments to providers such as Singulex.

71.    ABEs were told that they could expect there to be a three-month delay for their receipt of credit/commissions for tests from private insurance like UHC. For example, the revenue that Swartzell would see in March of a given year would likely have been for testing conducted in January. The delay was largely caused by UHC's payment process.

72.    ABEs at Singulex had access to a program called Tableau.  Tableau allowed ABEs to track data trends, such as the numbers and types of tests ordered by providers.

73.    In May 2016, Swartzell noticed an anomaly in her territories' revenues for payments by UHC. UHC reimbursement was decreasing. Such a decrease caused a decrease in commission pay to Swartzell.

74.    After noticing UHC revenue trending lower starting in May 2016, Swartzell contacted her manager, John Doe, at the time via phone call to discuss. She alerted him to the fact that this trend in revenue declining did not make sense as the territory was growing in business since 2015 with a large volume of that business being UHC – approximately $50,000 per month for UHC alone at the end of the first quarter.

RELATORS' THIRD AMENDED COMPLAINT                                    15

75.     John Doe stated that he would request to Brousseau that a review be done to understand what the issues were. Swartzell continued to follow up with John Doe throughout June and into July to determine the cause in UHC revenue decline.

76.     John Doe informed Swartzell in July that Brousseau still would not respond to him after several requests.

77.     Swartzell continued to inquire to John Doe, Byron Clenenden, Vice President of Human Resources at Singulex, James Gordon, Senior Data Analyst Manager at Singulex, and Brandon Hants, Chief Financial Officer at Singulex regarding the decline that she was seeing for UHC. Brousseau continued to ignore John Doe's requests, and then John Doe was terminated in early August 2016.

78.     After receiving no responses regarding the decline in UHC revenue, Swartzell then started working with Mark Goddard, East Regional Manager Director to try to get an understanding of the reason for the decline in UHC revenue.

79.      After months of emails and getting Byron Clenenden involved, Brandon Hants finally responded on October 20, 2016 to say that he did not cancel the UHC agreement for repricing, which caused the rate per test to drop from $44 to $8. Swartzell's review of Tableau revealed that the reimbursement rate had actually dropped from $44 to $5 per test. In either case, it represented a massive drop in revenue for Swartzell's territory.

80.     Singulex had failed to renew or renegotiate the agreement with UHC, so the pricing per test automatically dropped at the deadline.

81.     Swartzell and other ABEs played no role in negotiating, renewing, or cancelling contracts with insurance carriers.

82.     In October 2016, Mr. Hants told Swartzell that the repricing was since cancelled.

83. A three month grace period was required to correct the issue and return UHC reimbursements to a new/higher rate.

84. In December 2017, Swartzell followed up with Mr. Hants to check the status of the UHC agreement for 2017. Mr. Hants did not respond to Swartzell's inquiry.

85. On January 12, 2017, Brousseau emailed Swartzell to inform her that the UHC agreement was not cancelled until January 2017. The result was that the UHC reimbursement amounts would not be adjuster/increased until at least March 2017.

86. Swartzell calculates that she lost in excess of $13,000 in compensation due to Singulex's failure to correct the UHC contract issue in a timely manner.

87. Brousseau and Singulex's refusal to correct Swartzell's pay was in retaliation for her investigation and exposing Singulex's ongoing fraud relating to the addition of illegal and improper ICD10 (and ICD9) codes on test requisition forms and was done in an effort to constructively discharge Swartzell.

## G. Singulex's Failure to Pay Swartzell Commissions for Payments Submitted by Patients

88. In July 2016, Swartzell uncovered revenues collected that were left off of her commission report. She did so by reviewing the Weekly Billing Report (used to track patient check revenue).

89. When health insurers would receive bills for services provided to patients, some would send checks for payments directly to the patients, rather than paying Singulex. Many of the patients would deliver the check to their physicians' office, who in turn would give it to Swartzell for submission to Singulex. Swartzell would submit the payments to Singulex.

RELATORS' THIRD AMENDED COMPLAINT                                                    17

90.     In about July 2016, Swartzell noticed that one of her clients, Neighborhood Naturopathic, showed an uncharacteristically small amount of revenue for the month, yet Swartzell recalled sending insurance company checks in to Singulex that had been given to her by Neighborhood Naturopathic.

91.     Upon information and belief, Singulex failed to compensate Swartzell for her earned commissions for cash payments submitted by patients.

**H.     Addition of ICD10 Codes to Requisition Forms**

92.     In June and July 2016 Charlie Hewitt, IT Manager at Singulex trained ABEs including Swartzell on how they could use Singulex's Tableau software to look up the ICD10 codes submitted by doctors.  The purpose of this training was to allow ABEs to see what ICD10 codes doctors were using so that the ABEs could contact the physicians' offices to ask them to add more codes or higher reimbursing codes, as directed by Brousseau at the May 15 to 18, 2016 national sales meeting.

93.     Swartzell's training occurred on June 22 and 24, 2016. Mr. Hewitt conducted the training via Webex conference call and showed Swartzell how to access requisition forms. As an example of how to access the requisition forms, Mr. Hewitt showed Swartzell an example of a form that was completed with a disfavored ICD10 code and them showed her how it had been changed to include a high reimbursing ICD10 code, E78.

94.     Following the two calls with Mr. Hewitt, Swartzell decided to conduct further investigation and contacted the Singulex Physician Services department to inquire about how the E78 ICD10 code was added to the requisition used by Mr. Hewitt during the Webex conference call. Joshua Kramer from Physician Services confirmed that the nurse practitioner who completed the requisition mentioned by Mr. Hewitt was targeted for additional codes. Mr. Kramer informed Swartzell that there was no indication in the file as to how the E78 ICD10 code was added to the requisition.

RELATORS' THIRD AMENDED COMPLAINT                                     18

95.     When asked, Mr. Kramer informed Swartzell that the Physician Services department had been making calls to providers for over two weeks prior to June 24, 2016, with the purpose of telling the physicians' offices which codes to add to increase reimbursement.

96.     In July 2016, Swartzell, as part of her efforts to gather evidence of Singulex's fraudulent billing of federal government programs (Medicare, Medicaid, and Tricare) and expose the fraud, questioned John Doe, Byron Clenendon, and Eileen Erler, a Clinical Consultant, about the addition of codes to requisition forms submitted by doctor's offices. Swartzell made it known to these individuals that she would not comply with any fraudulent directives.

97.     In response to her questioning, John Doe told Swartzell and the rest of her region that they were not to comply with the fraudulent directive. Mr. Clenenden told Swartzell to report her concern to management, which she had already done. Ms. Erler agreed that ABEs should not be telling physicians to add three to five tests to requisition forms, nor should they be adding them themselves.

98.     On August 3, 2016, Swartzell received an email from her supervisor, John Doe, in which he informed his ABEs, including Swartzell that Laura Applegate, Director of Customer Operations at Singulex would be sending out the daily ABIQS ("billings in question"). The ABIQs were the billings that did not have sufficient ICD10 codes to satisfy Brousseau's May 2016 directive. The purpose of sending the list to ABEs was to have the ABEs contact providers regarding the addition of more codes.  However, in the email, John Doe instructed his team that they should not be guiding or suggesting which codes the medical providers should use.

99.     Within several days of John Doe's August 3, 2016 email, Singulex terminated John Doe.

100.     Upon information and belief, Singulex terminated John Doe because he instructed his sales team not to illegally tell medical providers to add improper ICD10 codes to the requisition forms.

101.    On August 11, 2016, during a national training conference call Swartzell asked a question regarding the reference ranges for a new test, which was a question that ABEs would likely be asked by providers.  During the call Brousseau called Swartzell's new manager, Mark Goddard, and told Mr. Goddard to tell Swartzell not to ask questions and to be quiet. Brousseau's comments were threatening and intimidating.

102.    By the time of this call Brousseau was aware that Swartzell was a vocal opponent of the plan to encourage providers to illegally add unnecessary billing codes to requisition forms. Brousseau's message to Swartzell via Mark Goddard was intended to be harassing, intimidating and threatening.

103.    On September 7, 2016, there was a regional conference call with Mark Goddard and Laura Applegate. During the call both Ms. Applegate and Mr. Goddard instructed the ABEs to add four additional tests to the already existing requisition forms. Ms. Applegate and Mr. Goddard also announced that Singulex would be using new requisition forms that included check boxes for highly reimbursed tests.

104.    Swartzell believed that the practice of having ABEs adding tests to requisition forms that were already completed by physicians would cause federal government programs to be overbilled and billed for unnecessary testing.

105.    Swartzell further believed that it was illegal to change provider panels without their knowledge as it would lead to unnecessary testing in violation of the FCA. Swartzell stated on the call that the practice of adding tests to requisition forms completed by physicians should not be done without provider signature and there was no response. Mr. Goddard then went on to state that, per Brousseau, sales reps would be in "a very bad situation" come the national sales meeting if this was not done for all provider requisitions.

106.    At the time of the call on September 7, Singulex management was aware that Swartzell had attempted to expose the company's fraudulent practices and gather evidence of the same by asking questions and sending emails. Singulex management viewed Swartzell as a troublemaker. The threats on the call were directed at Swartzell. Such threats and illegal directives caused Swartzell emotional distress. While Swartzell refused to participate in the fraud, she was afraid that she would be terminated at any moment for investigating the fraud, exposing the fraud, and by failing to participate in it.

107.    On September 13, 2016, Swartzell, by counsel, filed an FCA case against Singulex. The case was filed under seal and Singulex was not to be notified of the lawsuit.

108.    On September 28, 2016, Swartzell had a conference call with Laura Applegate and Mark Goddard to discuss getting additional testing sent to Singulex. During the call Ms. Applegate and Mr. Goddard asked Swartzell to pay phlebotomists kickbacks to direct testing to Singulex. Ms. Applegate informed Swartzell that the going rate to pay off phlebotomists was $45 per patient blood draw. During the call Ms. Applegate stated, "Vicki, I don't know how you feel about doing this, but other Singulex representatives are doing this in other parts of the country." Swartzell informed Ms. Applegate and Mr. Goddard that she would not be paying kickbacks to phlebotomists because the practice was a violation of the Stark Act and would result in FCA violations.

I.    **Swartzell Calls the Fraud Hotline Twice**

109.    Because of prior litigation relating to fraud by Singulex, it had a Corporate Integrity Agreement ("CIA") in place. Pursuant to the CIA, Singulex employees were given the number of a hotline to call for purposes of reporting illegal conduct at Singulex.

110.    Late in the summer of 2016, Swartzell made her first call to the fraud hotline in an effort to expose fraud. During the call she reported that she was asked to direct physicians to pick three

to five codes from the front of the requisition forms in order to gain higher reimbursement for the testing.

111.    Additionally, after the September 28, 2016 call with Laura Applegate and Mark Goddard, during which she was asked to pay kickbacks to phlebotomists, and in an effort to expose fraud, Swartzell called the anonymous hotline (800-886-0868) and reported the request that she pay kickbacks.

112.    The hotline was answered by a third party who took in the information and then conveyed it to the government and to Singulex.

113.    Patty Ryan, Compliance Officer for Singulex, received reports reflecting Swartzell's complaints.

**J.      Mark Goddard is Put on a Performance Plan**

114.    On December 1, 2016 Mark Goddard, Swartzell's supervisor, called and told her that Brousseau put Mr. Goddard on a performance plan, which required the addition of over 300 tests to physician orders per week. Mr. Goddard told Swartzell that he was having this conversation with all of the ABEs in his region. Mr. Goddard told Swartzell to do whatever it took to get the doctors to add tests, including asking them for favors.

115.    In response to Mr. Goddard's request that Swartzell ask physicians to add tests, Swartzell indicated that she would not be engaging in that behavior because it was fraudulent.

116.    Mr. Goddard responded by telling Swartzell that Brousseau told him that he had to perform to the level the other regions, and that the other regions' ABEs were adding tests to physician orders without the physicians' knowledge. Mr. Goddard then told Swartzell that Brousseau told him that he needed to perform at the level of the other regions.  Ms. Swartzell again indicated that she was not going to engage in fraud.

117.    Swartzell continued to collect evidence of the fraud, such as the emails sent by Mr. Goddard reflecting the push to add over 300 tests per week.

118.    On December 5, 2016, during a regional conference call with Mr. Goddard, Swartzell and the other regional ABEs, Mr. Goddard stated that he was asking all ABEs to do whatever it takes to get new tests onto the physician orders so that the 300+ test numbers per week goal could be achieved. Mr. Goddard told the ABEs that Brousseau told him that ABEs from other regions were adding tests without the ordering physicians' knowledge.

119.    Ivan Blancoe, an ABE on the call, responded to Mr. Goddard, stating: "Mark, you know what those other regions are doing to get to those numbers?" Mark stated, "Yes and I discussed this with Bob. He stated he doesn't care and that Mark's reps need to be at the levels of the other regions".

120.    On December 6, Swartzell emailed Byron Clenenden in the Singulex Human Resources department and asked for a time to talk.

121.    On December 8, 2016, in further effort to expose and stop Singulex's fraud and in an effort to gather additional evidence, Swartzell contacted Byron Clenenden and reported that Mr. Goddard and Brousseau were asking her and other ABEs to add tests to physicians' orders and ask physicians to add tests as a favor.

122.    On December 9, 2016, Mark Goddard was terminated by Singulex. The company's stated reason for why Mr. Goddard was terminated was because he mistakenly approved an expense report for ABE Ken Ireland, which included gift cards to be given to physician office staff.

123.    On December 12, 2016, Brousseau sent a regional email to ABEs informing them that Mr. Goddard had been let go and that Brousseau was seeking his replacement. Brousseau left Swartzell off of the email. Upon information and belief, Brousseau did not include Swartzell on the email so that

she could not apply for the position, in retaliation for her protected activity of gathering evidence and exposing Singulex's fraud, and in an effort to embarrass and constructively discharge Swartzell.

124.    On December 16, 2016, Brousseau announced that Mike Todd was the new Regional Sales Director.

### K.    Bob Brousseau Fails to Timely Reimburse Swartzell for Her Expenses

125.    On December 15, 2016, Brousseau contacted Swartzell to question her about the inclusion of band aides on her expense report, which Laura Applegate had directed her to purchase for the phlebotomists.

126.    On December 16, 2016, Brousseau failed to timely approve Swartzell's expense report, causing a delay in her receipt of $2,300 in reimbursable expenses. Brousseau timely approved the expense report of Heidi Antonietti, which was submitted at approximately the same time, but which contained errors.

127.    Brousseau's failure to timely reimburse Swartzell was in retaliation for her protected activity of exposing fraud, collecting evidence of fraud, and in an effort to constructively discharge her.

128.    On December 19, 2016, in order to get her expenses approved, Swartzell had to contact Zoe Bates in the accounting department at Singulex. Ms. Bates approved Swartzell's expense report.

### L.    Bob Brousseau Disproportionately Increases Swartzell's 2017 Goals

129.    On December 20, 2016, during a national conference call led by Brousseau, he informed the ABEs that the territory goals for 2017 would be an 11% increase with some territory goals being "a little bit higher." Brousseau also informed the ABEs that they would be given a new compensation plan and that they could not work until it was signed.

130.    On December 20, 2016, following the national conference call with Brousseau, Swartzell received an email from Travis Bales, her Regional Sales Director and supervisor, indicating that her 2017 test targets were not increased by the 11% referenced by Brousseau on the call, but by an astounding 33%.

131.    Upon information and belief, the increase in Swartzell's sales goals was directed by Brousseau.

132.    The 33% increase was particularly significant and unachievable for Swartzell's territory because of the decreased revenue relating to Singulex's failure to timely renew the UHC multi-plan agreement, addressed in paragraphs 69-88. Essentially, Singulex tanked Swarzell's revenue numbers because of the UHC issue, and then turned around and increased her goals for 2017.

133.    The tremendous increase in test goals for 2017 was done in retaliation for Swartzell's exposing Singulex's business practices, which were directed at defrauding federal government programs (Medicare, Medicaid, and Tricare), because she continued to gather evidence of the fraud by questioning the practices, and also in an effort to constructively discharge her.

134.    Swartzell was not allowed to work until she signed the 2017 commission plan with the new goals. Swartzell missed two days of work on January 3 and 4, 2017 because of Singulex's refusal to answer her questions about her test target for 2017.

135.    On or about January 2, 2017 Swartzell spoke with Byron Clenenden regarding the problem with the grossly inflated test target for 2017. Mr. Clenenden's advice to Swartzell was to sign the document and begin looking for another job.

136.    Swartzell continued to inquire about the source of the 2017 goals, and she continued to inquire about what the revenue goal (as opposed to test order goal) was, without response.

RELATORS' THIRD AMENDED COMPLAINT                                    25

137.    In addition to punishing Swartzell, Brousseau rewarded ABEs who engaged in Singulex's unlawful billing practices. For instance, during a January 31, 2017 meeting Brousseau handed out awards in the form of bonus checks to the five ABEs who had added the most new tests to physician requisition forms.

138.    Chris Small, a Singulex ABE, received a check for $10,990. When he went to Brousseau to accept his check, another ABE, Chris Kelderman, could be heard yelling out and then chanting, "That's a lot of Medicare Fraud."

139.    Brousseau, VP of Sales and Marketing, CEO Guido Baechler, and Compliance Officer Patty Ryan were all in attendance and must have heard the chant. None of them did a thing about it.

140.    During that same meeting, Brousseau announced that only 1.2% of Medicare claims were not reimbursed and that this low percentage was due to the sales representative coding initiative of working with providers to get them to add diagnostic codes.

**M.    Singulex's Failure to Timely Pay Swartzell's December 23, 2016 Commission**

141.    Swartzell was supposed to be paid a commission of $5,000 on December 23, 2016, but the payment did not arrive. Swartzell contacted other ABEs around the country and they all confirmed that they had timely received their commission payments.

142.    Swartzell contacted Kim Gilliam in payroll at Singulex to inquire about the status of her commission payment. Ms. Gilliam would not explain how it came to be that Singulex had failed to pay Swartzell her commission payment.

143.    When it arrived, Swartzell's commission payment was $310 short, and she was charged a $20 wiring fee by her bank.

144.    Upon information and belief, Singulex's failure to timely and fully pay Swartzell for her commissions due on December 23, 2016 was in retaliation for Swartzell's ongoing efforts to expose fraud, gather evidence of fraud, and in an effort to constructively discharge her.

**N.    Travis Bales Fails to Timely Pay Swartzell's Expenses**

145.    On January 16, 2017, Travis Bales emailed Swartzell and informed her that her expense report would not be approved because she failed to attach receipts. Swartzell confirmed that she had in fact submitted receipts. When Swartzell followed up with Travis Bales regarding whether she would be paid the expense reimbursement due, Mr. Bales ignored her emails. This issue caused Swartzell to have to wait an extra two weeks for her expense reimbursement of $1,618.94.

146.    Singulex's refusal to timely pay Swartzell's expense reimbursements constitutes harassment and evinces Singulex's animus toward Swartzell for her protected activities of exposing and documenting its fraud. It was also done in an effort to constructively discharge Swartzell.

**O.    Tuition Reimbursement**

147.    Swartzell participated in Singulex's tuition reimbursement program by taking healthcare-related courses at Waukesha Technical College in Waukesha, Wisconsin. This coursework had been approved for reimbursement by John Doe. After John Doe was terminated, and in retaliation for her gathering evidence of fraud, exposing fraud, and in an effort to constructively discharge Swartzell, Singulex, by Brousseau and Travis Bales rejected Swartzell's request for tuition reimbursement for the Fall of 2016.

148.    Singulex failed to pay Swartzell $572.60 owed for tuition reimbursement.

**P.    Travis Bales Undermines Swartzell and Advises Provider to Engage in Fraud**

149.    On February 28, 2017 Travis Bales was riding along with Swartzell to a meeting with Nurse Practitioner ("NP") Sharon Thurow, one of Swartzell's accounts. NP Thurow asked Swartzell

whether she should be picking three to five codes from the front of the requisition as she was instructed to do by Singulex's Physician Services Department.

150.    In response to NP Thurow's question Swartzell stated, "you don't need to worry about that. You put down whatever the diagnosis is for the patient. Don't worry if it is not on the front of the requisition."

151.    Mr. Bales, who was visibly upset with Swartzell's response, interjected "just please check off as many codes as possible from the front of the requisition."

152.    Because of Mr. Bales' hostile tone toward her and his illegal conduct in instructing NP Thurow on completion of the requisition form, Swartzell feared for her safety.

153.    Swartzell remained fearful throughout her employment that she was in physical danger because of the threatening and intimidating manner in which Brousseau and Travis Bales addressed her attempts to expose fraud and gather evidence of fraud.  Ride alongs and in-person meetings with Singulex management caused Ms. Swartzell severe and borderline crippling anxiety because she felt physically intimidated and threatened by management's conduct.

**Q.    Mobile Phlebotomy**

154.    Singulex utilized mobile phlebotomy services in most, if not all, of its sales territories. Mobile phlebotomists were sent to patients' homes to draw samples for submission to Singulex. Patients and providers both appreciated and utilized the mobile phlebotomy services.

155.    The mobile phlebotomy services in Swartzell's territory, which were initiated at the direction of Laura Applegate, became very popular with patients and providers in Swartzell's territory. The mobile phlebotomy services for Singulex testing became a significant part of Swartzell's business.

156.    When mobile phlebotomy services started in Swartzell's territory, the mobile phlebotomists were hired or contracted by Singulex.

RELATORS' THIRD AMENDED COMPLAINT                                          28

157.    Other territories using mobile phlebotomy had in-house Singulex support for the scheduling and coordination of patient test draws and shipping of the samples. However, Swartzell was not give any such support and was forced to support the program in her region by herself.

158.    Swarzell made numerous requests to Travis Bales, John Doe (prior to his termination), and Mark Goddard for in-house Singulex support for administering her territory's mobile phlebotomy program. Swartzell's requests for the same assistance other territories were receiving were ignored for months.

159.    On February 28, 2017, Travis Bales told Swartzell that Singulex had signed a contract with Iggbo to provide mobile phlebotomy services and mobile phlebotomy support for Swartzell's territory. Mr. Bales told Swartzell that the Iggbo mobile phlebotomy program for her territory would begin the second week of March, 2017. Mr. Bales instructed Swartzell to convey the update to providers.

160.    On March 14, 2017, Swartzell emailed Mr. Bales to inquire about the status of mobile phlebotomy service with Iggbo. Mr. Bales did not respond.

161.    On April 3, 2017, Brousseau emailed Travis Bales informing him that he had not heard back from Iggbo. Mr. Bales forwarded the email to Swartzell who emailed back questioning whether the contract had been signed as he (Mr. Bales) had previously represented.

162.    On May 5, 2017, Laura Applegate notified Iggbo that Singulex would not be moving forward with a contract with Iggbo for mobile phlebotomy and mobile phlebotomy support services. Ms. Applegate did not notify Swartzell until May 9, 2017 that Iggbo would not be used for mobile phlebotomy and mobile phlebotomy support services.

163.    On June 8, 2017, Travis Bales and Swartzell had a telephone conversation in which he, in a harassing manner, asked her what she was "doing to get business." Bales told Swartzell that she

was not "making efforts to increase day to day business." Bales' comments were intended to further Singulex's efforts to get Swartzell to illegally ask doctors to add medically unnecessary tests to their requisition forms, to punish her for gathering evidence of fraud, to punish her for exposing fraud, and in an effort to constructively discharge her.

164.    On June 9, 2017, Swartzell emailed Travis Bales to confirm their conversation in her efforts to collect evidence of Singulex's illegal practices. Furthermore, she sent a copy of the email to Byron Clenenden in Human Resources in an effort to further expose the fraud.

165.    On June 22, 2017, Travis Bales emailed Swartzell and notified her that Singulex was pulling mobile phlebotomy services for Swartzell's territory. The stated reasons were "liability" and "compliance" reasons. Swartzell asked whether the change was for all of the company. Mr. Bales indicated that it was.

166.    Providers had been notified in March 2017 that there would be mobile phlebotomy services available through an agreement with Iggbo. Providers and patients had begun scheduling mobile phlebotomy appointments for May of 2017 through about May 2018 and were understandably very upset when the services were cancelled.

167.    On August 1, 2017, Kevin Wong, Field Services for Singulex, confirmed that mobile phlebotomy vendors could still be used. This contradicts what Mr. Bales told Swartzell on June 22.

168.    Singulex's refusal to support the mobile phlebotomy program in Swartzell's territory and the cutting of the mobile phlebotomists in Swartzell's territory were in retaliation for her collecting evidence of Singulex's fraud, because of her exposing the fraud, and in an attempt to cut her pay and constructively discharge her.

**R.    Profitability Exercise**

169.    On May 19, 2017, Travis Bales emailed Swartzell identifying two providers that Mr. Bales intended to discuss with Swartzell regarding the "profitability exercise."

170.    Later on May 19, 2017, Travis Bales emailed Swartzell a list of the most profitable tests for Singulex to run. He asked Swartzell and the others on the email to use the list to upsell and switch existing clients. The subject of the email was "Most Profitable Tests."

171.    On the phone conversation with Mr. Bales, Swartzell was directed to get the two providers identified in the May 19, 2017 email to start using the tests from the "Most Profitable Tests" list. Swartzell responded that she would only speak to the account regarding testing for patients when medically necessary. Mr. Bales responded that Swartzell's account needed to start ordering these tests otherwise the accounts would be told that they can no longer order Singulex testing. Brousseau called the initiative the "Profitability Exercise."

## S.    April 2017 Commission Statement

172.    In May 2017, Swartzell reported a contradiction between her April 2017 commission statement and the data for the cash collected in the month. Swartzell's commission statement reflected $88,971 collected, yet the data in Tableau reflected that the total collected was $178,252.

173.    Swartzell's supervisor, Travis Bales, responded to her concern by explaining that the commission statement figures were based on the amount of cash collected. This was false, as the Tableau data included the amount of cash collected. Swartzell explained this to Mr. Bales.

174.    Singulex never paid Swartzell for the additional commissions owed for the April 2017 commission statement period of January through March 2017.

175.    Upon information and belief, Singulex shorted Swartzell's commission payments on other occasions as well.

176.     Singulex failed to pay Swartzell for commissions owed in the April 2017 commission statement in retaliation for her gathering evidence of Singulex's fraud, her efforts to expose the fraud, and in an effort to constructively discharge her.

**T.     July 25, 2017 Manager Ride Along**

177.     Upon information and belief, in about June 2017 Brousseau directed Travis Bales to conduct a ride along with Swartzell so that Bales could fabricate negative reports regarding her performance in order to terminate her.

178.     In late July 2017, Swartzell was notified that Travis Bales would be joining her for a ride along on July 26, 2017.

179.     Swartzell was afraid for her safety as certain members of management, including Travis Bales and Brousseau, were growing more upset with Swartzell's efforts to expose Singulex's fraudulent practices and her continued efforts to gather evidence of the fraud.

180.     On July 25, 2017, Swartzell sent an email to Brousseau (VP of Sales and Marketing), Travis Bales (her manager), Patty Ryan (Compliance), and Byron Clenenden (Human Resources) exposing much of Singulex's fraudulent conduct that violated the FCA and the company's retaliation for her efforts to expose fraud and gather evidence of the fraud.

181.     In response to Swartzell's email, Singulex cancelled the ride along.

182.     Swartzell was also informed that Singulex would conduct an investigation into her allegations.

**U.     Singulex's Constructive Discharge of Swartzell**

183.     After over a month of purported investigation into the conduct Swartzell emailed about on July 24, 2017, it became clear that Singulex was not willing to protect Swartzell or prohibit the fraudulent practices.

184.    Swartzell's fear that the ride along with Travis Bales would be rescheduled continued to increase.

185.    On September 11, 2017, Swartzell submitted a resignation email.

186.    Swartzell feared for her safety as a result of the hostile, intimidating, and retaliatory conduct of management at Singulex. Singulex's goal was to constructively discharge Swartzell.

187.    As a result of the constructive discharge by Singulex, Swartzell lost pay, lost benefits, and experienced other harms and losses.

## VI.    COUNTS

### COUNT I

### VIOLATIONS OF WISCONSIN LAW
### UNPAID WAGES

188.    Swartzell repeats and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

189.    At all relevant times, Singulex and Swartzell have been covered by Wis. Stat. § 109.01 *et seq.*

190.    At all relevant times, Swartzell was an employee of Singulex within the meaning of Wis. Stat. § 109.01(1r).

191.    At all relevant times, Singulex was an employer within the meaning of Wis. Stat. § 109.01(2).

192.    At all relevant times, Singulex employed Swartzell within the meaning of Wis. Stat. §§ 109.01 *et seq.*

193.    At all relevant times, Singulex willfully failed to properly pay Swartzell wages for all hours worked and for benefits and other remuneration owed by Singulex and earned by/due Swartzell in violation of Wis. Stats. §§ 109.03(1) and 109.03(5).

1

## COUNT II

2

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT'S
## ANTI-RETALIATION PROVISION, 31 U.S.C. § 3730(h)

3

4       194.    Swartzell repeats and re-alleges each and every allegation contained in the paragraphs

5   above as though fully set forth herein.

6       195.    Swartzell confronted Defendant about its fraudulent practices, gathered evidence of the

7   fraud, opposed the fraudulent practices, exposed the fraud and refused to participate in Defendant's

8   fraud.

9

10      196.    In violation of 31 U.S.C. § 3730(h), and as a result of Swartzell's confronting, gathering

11  evidence, opposing, exposure of, and refusal to participate in Defendant's fraudulent practices,

12  Defendant threatened, harassed, intimidated, sabotaged pay, cut pay, inflated sales goal, constructively

13  discharged, and otherwise discriminated against Swartzell.

14

## REQUESTS FOR RELIEF

15      WHEREFORE, Vicki Swartzell demands that judgment be entered in her favor and against

16  Defendant for the maximum amount of damages and such other relief as the Court may deem

17  appropriate on each Count.

18

19      Further, Relators request that they receive the maximum amount permitted by law of the

20  proceeds of this action or settlement of this action collected by the United States, plus reasonable

21  expenses necessarily incurred, and reasonable attorneys' fees and costs.

22

23      Further, Swartzell requests that she receive an order reinstating her to her position and restoring

24  her seniority, awarding back pay and double back pay, compensatory damages, unpaid wages plus a

25  50% enhancement thereto, interest, reasonable attorney's fees and costs, and all other damages and

26  relief available to her.

27

## DEMAND FOR JURY TRIAL

RELATORS' THIRD AMENDED COMPLAINT                                                    34

A jury trial is demanded in this case.

Dated:  February 8, 2019                    By: /s/ Thomas C. Lenz
                                            FIRST, ALBRECHT & BLONDIS, S.C.
                                            Thomas C. Lenz
                                            158 N. Broadway, Suite 600
                                            Milwaukee, WI 53202
                                            Tele: (414) 271-1972
                                            Fax:  (414) 271-1151
                                            tlenz@fabattorneys.com

                                            Joel H. Siegal, Esquire
                                            235 Montgomery Street, Suite 1060
                                            San Francisco, CA  94104
                                            Tel: (415) 777-5547
                                            Fax: (415) 777-5247

1   Joel H. Siegal, Esquire
2   235 Montgomery Street, Suite 800
    San Francisco, CA  94104
    Tel: (415) 777-5547
3   Fax: (415) 777-5247
    joelsiegal@yahoo.com
4
    FIRST, ALBRECHT & BLONDIS, S.C.
5   Thomas C. Lenz
    158 N. Broadway, Suite 600
6   Milwaukee, WI 53202
    Tele: (414) 271-1972
7   Fax:  (414) 271-1151
    tlenz@fabattorneys.com
8
9                   **UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10
    THE UNITED STATES OF AMERICA,      )
11  *ex rel.* JANE DOE and JOHN DOE      )
                                       )        Case No. 4:16-CV-05241-KAW
12                                     )
                                       )        **[PROPOSED]   ORDER   GRANTING**
13                                     )        **PLAINTIFF'S MOTION**
                    Plaintiffs,        )        **FOR LEAVE TO FILE THIRD AMENDED**
14                                     )        **COMPLAINT**
           v.                          )
15                                     )        Hearing Date: March 21, 2019
    SINGULEX, INC.                     )        Hearing Time: 1:30 PM
16                                     )        Courtroom: 4, 3rd Floor
                                       )
17                  Defendant.         )        The Honorable Kandis A. Westmore
                                       )        Complaint Filed: September 13, 2016
18                                     )        Trial Date: None Set
19
20
21
22
23
24
25
26
27
28

---
**1**

---

1

**[PROPOSED] ORDER**

2

IT IS HEREBY ORDERED THAT:

3

1.      The Court hereby **GRANTS** Plaintiff's Motion for leave to file a third amended

4

complaint.

5

6

IT IS SO ORDERED.

7

8

Dated: _____

9

_____
HON. KANDIS A. WESTMORE
United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Proposed] Order Granting Plaintiff's Motion for Leave to File Third Amended Complaint—4:16-CV-05241-KAW